**CHARLES JACQUIN ET CIE, INC.**

v.

**DESTILERIA SERRALLES, INC., Crown Marketing International and Howrene Wine & Spirit, Inc.**

Civ. No. 88–3040.

United States District Court, E.D. Pennsylvania.

Feb. 13, 1990.

Arthur H. Seidel and Stephen J. Meyers, Seidel, Gonda, Lavorgna & Monaco, P.C., Philadelphia, Pa., for plaintiff.

Albert Robin, Robin, Blecker, Daley & Driscoll, New York City, for defendants.

MEMORANDUM

LOUIS H. POLLAK, District Judge.

In this action, plaintiff Charles Jacquin Et Cie ("Jacquin") alleged that defendants, Destileria Serralles, Inc. ("DSI") and Crown Marketing International ("Crown"), infringed on its products' trade dress in

violation of section 43 of the Lanham Act, 15 U.S.C. § 1125(a), and state common law.

## A. Background

Since 1884, Jacquin has been engaged in the sale of alcoholic beverages. Plaintiff attributes at least one half of its sales to cordials. According to the testimony of Mr. Cooper, the principal shareholder of Jacquin and its President, up until about seven or eight years ago, its sales of cordials were about 300,000 cases per year. Now, because of the current slump of the industry, it sales have dropped to about 250,000 cases a year.

In 1968, Jacquin developed a particular bottle shape for its line of cordials and since that time has used substantially the same bottle shape for each of the cordials in its products line. Jacquin advertises and promotes its cordial line through the use of billboards, print ads, and promotional materials, and approximately 75% of its promotional materials include the bottle as part of the particular advertisement.

Approximately 75–80% of its cordial sales are in Pennsylvania. Eighty percent of its advertising budget is spent in Pennsylvania as well. The rest of Jacquin's sales are spread out over various states, primarily in the eastern part of the country. Most of Jacquin's sales take place in so-called control states, states which have a monopoly on the sale of some alcoholic beverages, including cordials.

Defendant DSI has been engaged in the sale and production of Puerto Rican rum since about 1865. In 1985, representatives of Peter Harvey Wines approached DSI to see if it was interested in producing a rum-based cordial. In 1986, DSI submitted to Owens–Illinois, Inc., a Blackstone whiskey bottle to be used as the model for the bottle in which to produce the rum-based cordial. That design, with modifications, became the Don Juan Schnapps bottle, the subject of this suit. In 1987, Crown entered into an agreement with DSI to distribute Don Juan Schnapps in the continental United States. In February of 1988, plaintiff sent Crown a cease and desist letter, and plaintiff commenced this suit in

April of 1988. Plaintiff demanded a jury trial.

As noted above, plaintiff alleged that defendants infringed on its cordial products' trade dress in violation of section 43 of the Lanham Act and state common law. At the close of plaintiff's case-in-chief, I directed a verdict for the defendant, denying plaintiff's claims for compensatory and punitive damages because I concluded that plaintiff had not established actual confusion. Issues of secondary meaning and the likelihood of confusion were, however, tried to the jury. The jury entered a verdict in favor of plaintiff finding that it had established secondary meaning and had shown a likelihood of confusion. The issues before me now are (1) whether this court is obligated to accept the jury verdict as binding, and (2) the extent of injunctive relief, if any, available to the plaintiff.

## B. The Role of the Jury

▮ Defendants argue that, because the only relief available to the plaintiff after I directed a verdict on the issue of actual confusion was equitable, plaintiff is not entitled to a trial by jury as of right. They argue that in such circumstances, the effect of the jury verdict is determined by reference to Rule 39(c) of the Federal Rules of Civil Procedure, which provides:

> In all actions not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury or, except in actions against the United States when a statute of the United States provides for trial without a jury, the court, with the consent of both parties, may order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter of right.

According to the defendants, Rule 39 provides two options: a trial before a jury whose verdict was binding or a trial by a jury whose verdict was advisory. Defendants, however, note that at the point I directed the verdict, neither party objected to the further proceedings before the jury, and thus, defendants concede that it is within the court's power to hold that the

parties implicitly consented to a trial by a jury whose verdict was binding.

Plaintiff argues that it was entitled to a jury trial as a matter of right for all of its claims under the principles established in *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) and its progeny. Plaintiff also notes that even if its right to a jury trial had been lost at the point I directed a verdict on the issue of actual confusion, the parties, by failing to object to the continuation of the trial before the jury, consented to a trial by jury whose verdict was binding.

It is not necessary for me to determine whether plaintiff had a right to a trial by jury after the directed verdict. Once the remaining issues were tried before the jury without any objection by either party, the parties implicitly consented to a trial by jury. *See Bereda v. Pickering Creek Industrial Park, Inc.*, 865 F.2d 49 (3d Cir. 1989). In *Bereda*, a Title VII case, the court noted that express consent to a jury trial, when a trial by jury does not exist as a matter of right, is not necessary: "If one party demands a jury, the other parties do not object, and the court orders a trial to a jury, this will be regarded as trial by consent." *Id.* at 52, quoting, C. Wright & A. Miller, 9 Federal Practice and Procedure § 2333 (1971). In this case, although I found that the plaintiff had not established actual confusion, and, therefore, that it would be inappropriate to place the question of damages before the jury, I did submit the issues of secondary meaning and likelihood of confusion to the jury. At that point, neither party objected to my decision.[1]

Under Rule 39(c), once the parties consent to a trial by jury, a court may in its discretion treat the jury as an advisory jury. That discretion, however, is not absolute. If an action, at the outset, is not tried to the jury as of right, but the parties consent to a jury trial, the court is required to notify the parties of the jury's advisory status no later than the time at which jury selection is begun. *Bereda*, 865 F.2d at 53.

A similar rule applies in this matter. If a court, after granting a directed verdict, were to convert what would otherwise be a nonadvisory jury into an advisory jury without any notice to the parties, it would undercut principles of fundamental fairness and judicial economy:

> Any good trial lawyer will testify that there are significant tactical differences in presenting and arguing a case to a jury as opposed to a judge. To convert a trial from a jury trial to a bench trial (or vice-versa) in the middle of the proceedings is to interfere with counsel's presentation of their case and, quite possibly, to prejudice one side or the other.

*Hildebrand v. Board of Trustees*, 607 F.2d 705, 710 (6th Cir.1979). *See also Bereda v. Pickering Creek Industrial Park, Inc.*, 865 F.2d 49, 53 (3d Cir.1989).

Accordingly, the jury's finding that the plaintiff established secondary meaning and the likelihood of confusion is binding. What remains to be decided, then, is the scope of relief available to the plaintiff given the jury's findings.

## C. Scope of Relief

At the close of the trial, the jury found that: (1) the shape of the plaintiff's bottle had acquired secondary meaning and (2) the defendants' bottle, as it appears in the marketplace, is likely to lead consumers to think that the defendants' product was produced by the plaintiff. Although the jury determined that Jacquin had established secondary meaning with respect to its cordial bottle, and that a likelihood of confusion existed, it is still necessary to determine the extent to which plaintiff's bottle has achieved secondary meaning. In other words, it is necessary to determine in which markets the defendants should be prohibited from using their bottle and for which products.

Plaintiff seeks to have the defendants prohibited from using their bottle for all

---

**1.** Although the defendants later expressed some doubt about whether the jury decision would be binding, they did not, at any point during the trial, object to submitting the remaining issues to the jury.

distilled spirits, that is all alcoholic beverages except wines and malt beverage, in the states of Alabama, Delaware, Iowa, Maryland, New Hampshire, New Jersey, North Carolina, Pennsylvania, Rhode Island, Vermont, Virginia, and West Virginia, areas where plaintiff contends that it has established a market for its cordial products. Defendants, on the other hand, would have me limit the injunction in its product scope to only cordials and specialties, and in geographic scope, to the state of Pennsylvania.

### 1. *Product Scope*

 Plaintiff contends that, because it not only sells cordials, but also, other forms of distilled spirits, it is entitled to injunctive relief prohibiting the defendants from selling any distilled spirits in the Don Juan bottle. Plaintiff argues that consumers familiar with the Jacquin bottle will assume a common source of origin between its trade dress and that of the defendants if the defendants are permitted to use their bottle to market any distilled spirit.

Defendants argue that the injunction should be limited to cordials and specialties because plaintiff did not present any evidence to show that defendants' bottle, if it were used for products other than cordials, would cause consumer confusion.

Under federal law, alcoholic beverages are classified into three broad groups: wines, malt beverages, and distilled spirits. These groups are then subdivided accordingly in various ways, for example, either according to the type of product (i.e., whiskey and gin) or according to the use of the product (i.e., table wines and aperitif wines). *See, e.g.,* 27 C.F.R. §§ 4.10, 5.22.

Plaintiff asserts that because cordials are taxed and categorized as distilled spirits under federal law, and are presented in the same general areas in stores as other distilled spirits, defendants should be

barred from using their bottle for any distilled spirit. In addition, plaintiff relies on several cases in which courts prohibited the use of similar marks even though the parties were using the marks on different types of alcoholic beverages. In *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149 (9th Cir.), *cert. denied,* 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963), for example, the court found that the use of the mark "Black & White" for both a beer and a scotch product would cause customer confusion, and thus, the court prohibited the later user from using the term for its beer product.

The cases relied upon by plaintiff are inapplicable to the matter at bar. Plaintiff did not present any evidence at trial showing that (1) its trade dress had acquired secondary meaning within the distilled spirit industry as a whole, or (2) consumers of distilled spirits (as opposed to consumers of cordials and specialties) would be likely to confuse plaintiff's trade dress with defendants' trade dress. Indeed, the evidence at trial focused solely on plaintiff's cordial products and did not address other distilled spirits. Moreover, if plaintiff's cordial sales are compared to the total distilled spirit market, instead of just the cordial market, its sales in states other than Pennsylvania are minimal.[2] Accordingly, to the extent that an injunction will issue, it will only cover cordials and specialties.

### 2. *Geographic Scope*

 In *Natural Footwear Ltd. v. Hart Schaffner & Marx,* 760 F.2d 1383, 1398–99 (3d Cir.), *cert. denied,* 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257 (1985), the court outlined the following four factors to be considered to determine whether the market penetration of a trademark, be it protected under the common law or under registration, is sufficient in an area to warrant protection: (1) the volume of sales of

---

2. In Alabama, plaintiff sold 371 cases of cordials compared to a distilled spirit market of 1,815,043 cases; in Iowa, 311 cases compared to 1,021,814 cases; in New Hampshire, 7,921 cases compared to 1,555,485 cases; North Carolina, 2,971 cases compared to 3,478,358 cases; in Vermont, 315 cases compared to 392,706 cases;

in Virginia, 12,112 cases compared to 3,049,543 cases; in West Virginia, 5,771 cases compared to 565,419 cases; in Montgomery County, Maryland, 276 cases compared to 303,599 cases and in Pennsylvania, 219,918 cases compared to 5,269,908 cases. *See* Defendants' Reply Memorandum at 6.

the trademark product; (2) the growth trends (both positive and negative) in the area; (3) the number of persons actually purchasing the product in relation to the potential number of customers; (4) the amount of product advertising in the area.

### a. Volume of Sales

In the so-called control states, a comparison of plaintiff's cordial sales to total cordial sales in a particular state is as follows:

| STATE | JACQUIN SALES | TOTAL SALES | PERCENTAGE |
|---|---|---|---|
| Alabama | 371 | 67,622 | 5.4 |
| Iowa | 311 | 213,095 | .14 |
| New Hampshire | 7,921 | 306,044 | 2.58 |
| North Carolina | 2,971 | 175,680 | 1.69 |
| Vermont | 315 | 82,469 | .38 |
| Virginia | 12,112 | 225,034 | .53 |
| West Virginia | 5,771 | 59,705 | 3.8 |
| Pennsylvania | 219,918 | 945,223 | 23.26 |

In each of the above market areas, except Pennsylvania, plaintiff's cordials are a great deal less than 10% of the total cordial market, and, in all but two areas other than Pennsylvania, plaintiff's sales are even less than 3% of the total market. It does not appear, therefore, that plaintiff, under this factor, has established a sufficient market penetration to warrant injunctive relief in any state but Pennsylvania.

Plaintiff asserts that because the dollar value of its sales in each state exceeds $5,000, it has established that it sufficiently penetrated the cordial market in the above states under the *de minimis* test outlined in *Natural Footwear.* Plaintiff, however, misapplies the *de minimis* test.

In *Natural Footwear*, a case involving infringement of the mark "Roots," the lower court enjoined the defendant from using the mark anywhere in the continental United States without having considered the above factors. The Court of Appeals reversed, noting that plaintiff's sales in all states but New York and Pennsylvania did not exceed $5,000, an amount the court stated was necessary to warrant any form of relief. In New York and Pennsylvania, however, plaintiff had sales of $36,000 and $11,000, respectively. The court held that despite having sufficient sales to meet the *de minimis* test, plaintiff had not suffi-

ciently penetrated the market in those states to justify injunctive relief:

> We are persuaded in particular by the available evidence of Roots' sales, which indicates that, although Roots' business in the two states was not *de minimis* at the time Natural [the defendant] registered its mark, it was also not substantial by any measure. In light of such low sales, Roots had to come forward with particularly persuasive evidence as to each of the final three factors.

*Natural Footwear Ltd.,* 760 F.2d at 1403.

■ Thus, the mere fact that a plaintiff has sales in a particular area of more than $5,000 does not necessarily establish that a plaintiff has sufficiently penetrated a market to justify injunctive relief. Accordingly, I must consider plaintiff's evidence on the remaining three factors to see if it is "particularly persuasive" to make up for the low volume of sales in states other than Pennsylvania.

### b. Growth Trends

Plaintiff did not present specific evidence regarding the growth of the sales of its cordials in the relevant states. Plaintiff acknowledged that its sales overall had dropped in the last year, but it attributed that drop to the general decline in the consumption of alcoholic beverages.

### 3. The Number of Consumers

Again plaintiff did not present evidence, beyond the figures outlined above, of the actual numbers of customers. Such evidence, however, in the area of alcoholic beverages would be quite difficult to present given that consumers not only purchase the product from stores, but also from bars, restaurants, and the like.

### 4. Advertising

Plaintiff did present evidence describing the extent of its advertising and promotion. In 1986, plaintiff spent a total of $348,042 in 1986, $228,920 in 1987 and $157,054 in 1988. Eighty per cent of those expenditures were made for advertising and promotion in Pennsylvania. Plaintiff also has a sales force of about 50 people, sixteen of

whom are assigned to Pennsylvania. Although plaintiff described in detail the types of advertising and promotional techniques it uses, it did not provide evidence of expenditures for any state but Pennsylvania.

Having considered the four factors, I find that plaintiff has established a significant market penetration in Pennsylvania, but I do not find that it has established market penetration in any other state. Although it has made sales in each of the states outlined above, those sales are not substantial enough to warrant injunctive relief, and in the absence of other persuasive evidence, I conclude that plaintiff is not entitled to protection in any state but Pennsylvania. An appropriate order will follow.

## ORDER

For the reasons stated in the accompanying memorandum it is hereby ORDERED and DIRECTED that:

(1) Final Judgment is entered in favor of plaintiff, Charles Jacquin Et Cie, and against defendants, Destileria Serralles, Inc., and Crown Marketing International;

(2) The defendants are enjoined from selling cordials and specialties in the trade dress which is the subject of this action in the state of Pennsylvania.